*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

## DISTRICT OF COLUMBIA COURT OF APPEALS

No. 24-CV-0573

DISTRICT OF COLUMBIA METROPOLITAN POLICE DEPARTMENT, APPELLANT,

V.

DISTRICT OF COLUMBIA PUBLIC EMPLOYEE RELATIONS BOARD, *et al.*, APPELLEES.

Appeal from the Superior Court
of the District of Columbia
(2023-CAB-002461)

(Shana Frost Matini, *Judge*)

(Argued October 8, 2025                    Decided May 21, 2026)

*Stacy L. Anderson*, Senior Assistant Attorney General, with whom *Brian L. Schwalb*, Attorney General for the District of Columbia, *Caroline S. Van Zile*, Solicitor General, *Ashwin P. Phatak*, Principal Deputy Solicitor General, and *Carl J. Schifferle*, Deputy Solicitor General, were on the brief, for appellant.

*Geoffrey H. Simpson* for appellee Public Employee Relations Board.

*Daniel J. McCartin*, with whom *Benjamin J. Campbell* was on the brief, for intervenor Fraternal Order of Police/Metropolitan Police Department Labor Committee.

Before BECKWITH and MCLEESE, *Associate Judges*, and THOMPSON, *Senior Judge*.

Opinion for the court by *Senior Judge* THOMPSON.

Dissenting opinion by *Associate Judge* BECKWITH at page 31.

THOMPSON, *Senior Judge*: This matter returns after a remand in which we directed that the Public Employee Relations Board (PERB) explain its decision not to set aside an arbitral award as "on its face contrary to law and public policy." *See D.C. Metro. Police Dep't v. D.C. Pub. Emp. Rels. Bd.*, 282 A.3d 598, 605, 606 (D.C. 2022) ("*Thomas I*"). On remand, PERB explained its decision and again upheld the arbitral award, and the Superior Court (again) affirmed. For the reasons set forth below, we affirm the judgment upholding PERB's decision.

## I.      Facts and Procedural History

A general factual background and the earlier procedural background are set out in *Thomas I*. *See id.* at 601-02. We repeat some of that background here, focusing on the facts most pertinent to the issues on remand. In 2009, District of Columbia Metropolitan Police Department (MPD) Officer Michael Thomas, while off duty, twice shot Mr. Julio Lemus outside a residence in Hyattsville, Maryland, seriously injuring and nearly killing Mr. Lemus. *Thomas I*, 282 A.3d at 601. Officer Thomas had stepped outside the residence and off its porch after seeing someone (Mr. Lemus) near his car and suspecting that the person was trying to break into the vehicle.[1] Officer Thomas was outside of his jurisdiction and had been trained to call

---

[1] The arbitrator found that the following was not disputed: After hearing the vehicle alarm go off on his automobile key fob, Officer Thomas asked his fellow officer, Hope Mathis, who was in the residence with him, to turn off the house alarm.

911 in that situation "before taking any police action in response to a nonviolent property crime." *Id.* at 601. He did not call 911, however, and he contended that he shot Mr. Lemus after first identifying himself as a police officer, instructing Mr. Lemus to leave, and directing him to show his hands when he did not leave, and after Mr. Lemus instead placed his hand inside the pocket of his hoodie as he approached Officer Thomas.[2] Lemus testified that he had his hands up at the time of the shooting, but reportedly told Hyattsville Police Department investigators that he was intoxicated at the time of the incident and told Hyattsville police that he had no recollection of the shooting.[3] Police found on Mr. Lemus no weapon and no "paraphernalia or instruments indicating that [he] was trying to break into" a vehicle. The State's Attorney Office for Prince George's County, Maryland, declined to

---

After she did so, and after both looked through a glass panel of the front door and saw a person next to Officer Thomas's vehicle, Officer Thomas "got dressed and retrieved his holstered weapon," went out the front door and down one flight of stairs, and then walked on a short pavement and down a second set of stairs to ground level and toward the vehicle and the person near it.

[2] Officer Mathis also testified that Mr. Lemus, who was wearing a "sweater hoodie," was advancing toward Officer Thomas and "started to reach into his sweater," but that she "wasn't sure if he was armed."

[3] Mr. Lemus testified before the MPD Adverse Action Panel, however, that he had been drinking that night, placed a bottle of beer on top of the vehicle as he stopped alongside it to urinate, noticed someone (Officer Thomas) who never identified himself as a police officer "charging at him" from behind, and was shot as he tried to run away.

bring any charges against Officer Thomas or Mr. Lemus based on the incident, finding "[n]o evidence of criminal activity."

After internal MPD reviews of the incident, and after the MPD Chief of Police proposed that Officer Thomas be terminated from his position, his union, the Fraternal Order of Police (FOP), demanded arbitration pursuant to its collective bargaining agreement (CBA) with MPD. The arbitrator was charged with answering two questions: (1) whether the MPD presented sufficient evidence to support the "alleged charges" against Officer Thomas (in short, involvement "in the commission of any act which would constitute a crime" and violation of MPD General Orders pertaining to when deadly or lethal force may be used), and (2) whether termination was an appropriate remedy. In answering the first question, the arbitrator found "the evidence presented by MPD to be sufficient to support the alleged charges." The arbitrator reasoned as follows:

> [I]t is clear that had ... Officer Thomas called 911 to report to the Hyattsville police that someone was standing near his car and had set off an alarm and had not gone out of the house with a gun and confronted that person, none of the following events culminating in shooting that individual twice would have occurred. Mr. Lemus [was not armed and] was not breaking into the car, damaging the car or committing any crime. Officer Thomas did not have legal authority in another jurisdiction to give police orders to an individual who was not committing a crime. Officer Thomas put himself and Mr. Lemus in harm[']s way by walking off the porch with his gun and approaching Mr. Lemus. This was compounded by his

> shooting Mr. Lemus, not once but twice nearly resulting in his death. . . . Officer Thomas'[s] actions that fateful day were reckless and . . . [he] exercised incredibly poor judg[]ment.
>
> I find that Officer Thomas . . . violate[d] the Maryland statute which defines reckless endangerment and did recklessly engage in conduct that created a substantial risk of death or serious injury[.]
>
> I find [that] Officer Thomas . . . fail[ed] to obey orders or directives by the Chief of Police [specifically, the rules that] "Members of the Metropolitan Police Department may use deadly force in the performance of police duties . . . [w]hen it is necessary and objectively reasonable" and "No member shall draw and point a firearm at or in the direction of a person unless there is a reasonable perception of a substantial risk that [the situation may escalate to] the point where lethal force would be permitted."] . . . The actions of Officer Thomas, using deadly force were not "objectively reasonable" provided the facts and circumstance[s] present[.]

The arbitrator also determined, however, that the MPD's proposed termination was not an appropriate penalty. The arbitrator reduced the proposed termination to a 45-day suspension, the same discipline that an FOP exhibit showed had been imposed in the case of one Officer Edward Ford (whose case we discuss in somewhat more detail below).

In its initial (May 17, 2018) decision, PERB sustained the suspension, and the Superior Court upheld the initial PERB decision. In *Thomas I*, we vacated the Superior Court's ruling and directed that the initial PERB decision be remanded. *Thomas I*, 282 A.3d at 606. In the portion of the initial PERB decision that we held

necessitated a remand, PERB had dismissed the MPD's contention that enforcement of the arbitration award would be "on its face contrary to law" without specifically addressing some of MPD's arguments, 282 A.3d at 605, and had not "adequately explained its decision not to set aside the arbitral award as against public policy." *Id.* at 606.

In its March 16, 2023, Decision and Order on Remand, PERB again upheld the arbitrator's decision, and the Superior Court again affirmed. This appeal followed.

MPD once again contends that the arbitrator's decision was on its face contrary to law and that enforcement of the arbitral award would be contrary to public policy. MPD asks us to reverse and to require that the arbitrator's decision be vacated or, alternatively, to remand again for clarification from the arbitrator.

## II.    Standard of Review

Although this appeal is from a decision of the Superior Court, our task is to review PERB's decision "as if the matter had been heard initially in this court." *Thomas I*, 282 A.3d at 602 (quoting *Gibson v. D.C. Pub. Emp. Rels. Bd.*, 785 A.2d 1238, 1241 (D.C. 2001)). MPD contends that our review should be "de novo without deference to PERB," while PERB asserts that "controlling law . . . gives PERB's decision deference." We do not resolve that dispute; rather, because we agree with

PERB's decision to uphold the arbitral award, we shall assume without deciding that our review is de novo.

### III.   Discussion

D.C. Code § 1-605.02(6) provides that PERB (which is authorized under that section to "[c]onsider appeals from arbitration awards pursuant to a grievance procedure") may overturn arbitral awards only under a set of limited circumstances, including where an arbitral award "on its face is contrary to law and public policy." In the discussion below, we consider whether the facts of this case present one of those limited circumstances.[4]

### A. Whether the Arbitral Award Is on Its Face Contrary to Law

As we noted in *Thomas I*, one circumstance in which an arbitral award will be deemed to be "on its face contrary to law" is where the arbitrator "looks to an external law for guidance and purports to apply that law, but overlooks or ignores the law's express provisions." 282 A.3d at 604 (citing *FOP/Dep't of Corr. Lab. Comm. v. D.C. Pub. Emp. Rels. Bd.*, 973 A.2d 174, 178 (D.C. 2009). The MPD has advanced three arguments as to why the arbitral award here presents that

---

[4] As in *Thomas I*, we proceed on the assumption that the arbitral award should properly be set side if the award on its face is contrary to either law *or* public policy. 282 A.3d at 604.

circumstance. For the reasons discussed below, we are unpersuaded by MPD's arguments and conclude that the arbitral award is not on its face contrary to law.

MPD's first argument relates to the arbitrator's discussion of so-called *Douglas* Factor 7, "[c]onsistency of the penalty [proposed by MPD] with those imposed upon other employees for the same or similar offenses." *See Douglas v. Veterans Admin.*, 5 M.S.P.R. 280 (1981). Noting that the MPD Adverse Action Panel "cited no disciplinary decisions" in which an employee had been terminated for misconduct similar to Officer Thomas's, the arbitrator criticized MPD's consideration of Factor 7 as "without proof, when proof is required." By contrast, the arbitrator noted, "[t]hree disciplinary cases were part of the record provided" to him by FOP, and, as noted above, the arbitrator went on to rely on and adopt the penalty MPD imposed in one of those cases (the matter of Officer Ford). MPD argues that the arbitrator's reasoning was contrary to law in that the arbitrator required "proof" about penalties imposed in similar cases even though, MPD argues, under *Douglas* "no such proof" is required unless and until the disciplined employee "shows disparate treatment" (a showing MPD asserts Officer Thomas did not make). MPD relies on this court's statements in *MPD v. D.C. Off. of Emp. Appeals*, 88 A.3d 724 (D.C. 2014), *as amended* (May 22, 2014), that "[t]here is no requirement that an agency articulate its *Douglas* analysis *before* terminating an employee," *id.* at 730 n.3, and that an "agency's burden [under *Douglas*] . . . is triggered by the appellant's

initial showing that . . . the agency treated similarly-situated employees differently," *id.* (quoting *Boucher v. U.S. Postal Serv.*, 118 M.S.P.R. 640, 649 (2012)).

MPD is correct about its burden under *Douglas*. MPD also correctly asserts that FOP, in its submissions to the arbitrator, did not show that the officers involved in the three cases it cited (including Officer Ford)—all of whom were disciplined through a penalty less severe than termination—were similarly situated to Officer Thomas in all relevant respects. Indeed, as MPD emphasizes, the record before us contains very little information about any of those three cases. However, we reject MPD's argument that the arbitrator's having premised his decision on MPD's failure of "proof" rendered his decision contrary to the requirements of *Douglas* and thus on its face contrary to law. We reject MPD's argument because, as we noted in *Thomas I*, we are unable to say that the arbitrator purported to apply *Douglas. See* 282 A.3d at 605 (reasoning that "it is not at all clear" that the arbitrator "understood himself to be conducting the . . . review authorized under *Douglas*" rather than to be exercising his general authority to modify the sanction selected by MPD). We therefore cannot say that the arbitrator's decision was on its face contrary to law in the sense of purporting to apply *Douglas* but overlooking or ignoring its requirements. For that reason, we agree with PERB that "[t]he record does not reflect that the [a]rbitrator imposed an additional burden of proof on MPD outside of

exercising his equitable powers to review the Panel's application of the *Douglas* factors."

MPD's second argument as to why the arbitrator's decision was on its face contrary to law is that the arbitrator considered each *Douglas* factor individually, rather than evaluating whether MPD "conscientiously consider[ed] the relevant [*Douglas*] factors and . . . str[uck] a responsible balance within tolerable limits of reasonableness" (quoting 5 M.S.P.R. at 306). Again, because it is not clear from the face of the arbitral decision that the arbitrator purported to adhere to *Douglas*, we cannot say that the arbitrator used an erroneous approach in evaluating MPD's balancing of the *Douglas* factors. We agree with PERB that there was no need to "address[] [this issue] further on remand."[5]

MPD's third argument as to why the arbitrator's decision was on its face contrary to law is that the 45-day suspension the arbitrator imposed was "so arbitrary" and "so disproportionate to the severity of [Officer] Thomas's misconduct as to be contrary to law." Citing this court's recognition in *Thomas I* that "[i]n sufficiently extreme circumstances, an arbitrator's selection of penalty could be so

---

[5] As MPD argues, *Thomas I* may have "precluded PERB from ruling [, without first seeking clarification from the arbitrator,] that the arbitrator was relying on his equitable powers rather than applying *Douglas*." But *Thomas I* does compel us to recognize that the arbitrator's decision does not *clearly* show on its face that the arbitrator purported to apply *Douglas* while overlooking its requirements.

arbitrary and capricious as to be on its face contrary to law," 282 A.3d at 605, MPD asserts first that Officer Thomas's misconduct is so dissimilar to the misconduct involved in the Ford matter as to make the comparison inapposite and irrational. But the record as it pertains to the Ford matter—which contains only the MPD charging document and a description of the penalty that was ultimately imposed on Officer Ford (i.e., no details about why MPD reduced a proposed termination of Officer Ford to a 45-day suspension)—makes that claimed dissimilarity far from clear. Officer Thomas fired two shots at an unarmed civilian whom he suspected of tampering with his vehicle, seriously injuring him. Officer Ford's conduct was seemingly less culpable than Officer Thomas's in some respects (according to the MPD charging document, Officer Ford assertedly fired only one shot at a civilian, doing so after the civilian, whom he suspected of stealing his property, "started swinging and kicking towards" him and "lunged forward" toward him), but it seemingly was more egregious than Officer Thomas's conduct in other respects (in that Officer Ford disobeyed his superiors' specific, direct orders not to pursue the civilian, and in that the civilian died after Officer Ford shot him).[6] On the limited record that is before us and that was before the arbitrator, we cannot say that the arbitrator acted in a way

---

[6] MPD asserts that (unlike Thomas), Officer Ford "did not engage in criminal misconduct," but the record does not so establish (though MPD is correct that the MPD charging document did not charge Officer Ford with criminal misconduct).

that was on its face contrary to law by reducing the discipline for Officer Thomas from termination to the same penalty imposed in the Ford matter.[7]

In asserting that the reduced penalty of a 45-day suspension is contrary to law, MPD also argues that termination "surely . . . must be mandatory where a law enforcement officer engaged in a violent, reckless, life-threatening criminal act against a member of the public with no mitigating circumstances." Although Officer Thomas's misconduct undoubtedly was serious, we are unpersuaded by this additional argument because we cannot say that a 45-day suspension—a suspension without pay for more than six weeks—is, on its face, a non-severe sanction.[8] Indeed, courts have recognized that a suspension is a "very severe sanction." *In re Cichowicz*, 213 N.E.3d 1022, 1024 (Ind. 2023) (reasoning, in a case involving judicial misconduct that "permeated [a judge's] entire 4-year career as [a] probate

---

[7] That is especially so given that the Thomas record contained information (specifically, Officer Thomas's lack of any prior disciplinary history during his three years as an officer and his superiors' assessment that he was a dependable officer) that could have informed the arbitrator's finding that it was "questionable" that no sanction other than termination could deter similar conduct in the future.

[8] We also note that the Maryland Court of Appeals held several years ago that imperfect self-defense (i.e., the "subjective honest belief" that action was necessary for one's safety) *can* mitigate the offense of assault with a firearm. *See Christian v. State*, 951 A.2d 832, 833, 842, 848 (Md. 2008); *but see State v. Wilkerson*, No. 1915, 2025 Md. App. LEXIS 287, *28 (Apr. 7, 2025) ("It is an unsettled question of law [after an intervening decision] whether imperfect self-defense continues to mitigate first-degree assault.").

judge," that "[s]uspensions longer than 30 days 'reflect extremely serious judicial misconduct, just shy of what might warrant removal from office.'"). We also note the FOP's representation at oral argument that a thirty-day suspension is the maximum nontermination sanction recommended under the CBA, and case law indicates that thirty days is the maximum nontermination sanction for police officers in some other jurisdictions as well.[9] Further, case law from other jurisdictions shows that courts have treated nontermination penalties as severe sanctions for conduct contrary to police officers' sworn duties to protect the public. *See, e.g., FOP, Lodge 8 v. City of Cleveland*, No. 102565, 2015 Ohio App. LEXIS 4157, *8 (Ohio Ct. App. Oct. 8, 2015) (holding that year-long demotion of police sergeant, with attendant substantial loss in pay, as sanction for his sitting idle for five minutes instead of responding to an emergency call was not contrary to public policy). We therefore are not persuaded that the sanction chosen by the arbitrator is self-evidently disproportionate to the seriousness of Officer Thomas's misconduct so as to be on its face contrary to law.

---

[9] *See, e.g., City of Seattle v. Seattle Police Officers' Guild*, 484 P.3d 485, 494 n.6 (Wash. Ct. App. 2021); *City of Little Rock v. Starks*, No. CV-20-336, 2021 Ark. App. 362, *2 (Ark. Ct. App. Sep. 29, 2021); *Marigliano v. Bd. of Fire & Police Comm'rs*, No. 1-14-1954, 2015 Ill. App. Unpub. LEXIS 1748, *2 (Aug. 6, 2015); *Louisville by Kuster v. Milligan*, 798 S.W.2d 454, 456 (Ky. 1990).

**B. Whether the Arbitral Award Is on Its Face Contrary to Public Policy**

To warrant disturbance of an arbitral award, "a public policy alleged to be contravened 'must be well defined and dominant, and is to be ascertained by reference to the laws and legal precedents and not from general considerations of supposed public interest.'" *D.C. Pub. Emp. Rels. Bd. v. FOP/Metro. Police Dep't Lab. Comm.*, 987 A.2d 1205, 1208 (D.C. 2010) (quoting *W.R. Grace & Co. v. Loc. Union 759, Int'l Union of United Rubber, Cork, Linoleum & Plastic Workers of Am.*, 461 U.S. 757, 766 (1983)). As we noted in *Thomas I*, *see* 282 A.3d at 606, it is undisputed that there is a dominant public policy against the criminal use of deadly force by police. *See, e.g.*, D.C. Code § 5-123.02 (providing that an officer "who uses unnecessary and wanton severity [against] any person shall be deemed guilty of assault and battery"), and 6A D.C.M.R. § 207 (providing that an MPD officer shall not discharge his or her firearm except "[t]o defend him or herself or another from an attack which the officer has reasonable cause to believe could result in death or serious bodily injury"). However, as PERB acknowledged in its Decision on Remand, "[t]he issue is not whether [Officer Thomas's] misconduct violated public policy, but rather whether enforcing the arbitral award would do so" (quoting *Thomas I*, 282 A.3d at 606 (citing *E. Associated Coal Corp. v. United Mine Workers of Am.*, 531 U.S. 57, 62-63 (2000))).

Citing the absence of explicit law precluding Officer Thomas's reinstatement, PERB undertook a "fact-specific inquiry" to determine whether the arbitrator's penalty decision was on its face contrary to public policy. PERB looked to several factors, including

> whether there is a longstanding practice of requiring the termination of similarly situated employees, the severity of the employee misconduct, the potential for employee rehabilitation, the employee's prior history of misconduct, the likelihood of repeat offense, the employee's amenability to discipline, whether an arbitral award reinstating an employee is conditioned on other forms of discipline, and other fact-specific mitigating factors.

PERB then concluded:

> MPD does not assert that it has removed other police officers for similar offenses. As FOP notes, MPD reinstated the terminated officer in *Ford*, a case in which the Arbitrator found the officer's misconduct similar to that of the Grievant. The Arbitrator further noted that there was a good chance of the Grievant's rehabilitation in this case. Finally, the Arbitrator's reversal of the Grievant's termination was conditioned upon the imposition of a 45-day suspension. Based on the facts of the case, the Board finds that MPD has not demonstrated that the reinstatement Award is contrary to public policy.

MPD argues that this court should reject PERB's conclusion given the public policies reflected in D.C. Code § 5-107.01(f) and 6B D.C.M.R. § 873.11, which it contends "indicate that the only acceptable penalty for [Officer] Thomas's misconduct is termination." D.C. Code § 5-107.01(f) was enacted by the Council of

the District of Columbia (Council) as part of the Comprehensive Policing and Justice Reform Amendment Act of 2022 after the murder of George Floyd. *See* D.C. Law 24-345, 70 D.C. Reg. 7904 (June 2, 2023). Section 5-107.01(f) provides in pertinent part that "[a]n applicant shall be ineligible for appointment as a sworn member of the Metropolitan Police Department if the applicant: (1) [w]as previously determined by a law enforcement agency to have committed serious misconduct, as determined by the Chief by General Order[.]" MPD argues that section 5-107.01(f) "reflects a strong policy against employing officers who have engaged in . . . the unlawful use of deadly force like the arbitrator found [Officer] Thomas to have committed here." 6B D.C.M.R. § 873.11 provides in pertinent part that "[a] candidate is ineligible to become a police officer if the candidate has . . . (a) [e]ngaged in any conduct which would constitute a felony in the District of Columbia, whether or not the conduct resulted in the arrest of the candidate or the filing of criminal charges[.]" MPD argues that, "by implication," Section 873.11 precludes such persons from remaining police officers after engaging in a felonious criminal act.[10]

---

[10] MPD's brief does not express a view about whether, by implication, Section 873.11 would preclude a person from remaining a police officer after engaging in one of the other offenses the Section lists as rendering a candidate ineligible to become a police officer, such as a conviction of misdemeanor simple assault, *see* Section 873.11(b)(1), or a recent conviction of driving while intoxicated, *see* Section 873.11(c).

There is some force to MPD's argument that public policy regarding whether to retain officers who have engaged in the unlawful use of deadly force (or some other felonious criminal act) should be the same as public policy regarding the hiring of police officers. However, for the reason discussed below, we reject MPD's argument that the foregoing statutory or regulatory provisions preclude enforcement of the 2017 arbitral award in this case, which retained Officer Thomas on the force after he engaged in such a criminal act in 2009.

In enacting the Comprehensive Policing and Justice Reform Amendment Act of 2022, the Council included a number of provisions in response to demands for greater police accountability. Report on Bill No. 24-0320 before the Committee on the Judiciary and Public Safety, Council of the District of Columbia, at 2 (Nov. 30, 2022) (Committee Report). In addition to enacting Section 5-107.01(f) to amend the minimum standards for police officers, the Council enacted D.C. Code § 1-617.08(c) in response to "evidence that the current collective bargaining agreement governing the disciplinary process for MPD officers has not resulted in a meaningful system of accountability." Committee Report at 32; *see also id.* at 31 (citing a Police Reform Commission report finding that "arbitrators in DC ruled that MPD had to reinstate 39 of 86 officers it fired"). Specifically, the Council acted to "make[] the discipline of sworn law enforcement personnel a sole management right" "that cannot [be]

negotiated during collective bargaining." Committee Report at 32, 119.[11] The Council delayed the effective date of this amendment, however, "to avoid any interference with collective bargaining agreements already in effect," "allowing employees to challenge disciplinary actions under the negotiated grievance process of any existing collective bargaining agreement . . . if, on or before the effective date of this subsection [April 21, 2023], MPD has issued a final agency decision." *Id.* at 10, 32; *see* 70 D.C. Reg. 7904; D.C. Code § 1-617.08(c)(1), (2).[12]

---

[11] It appears that proponents of this legislation acted on an observation this court made in rejecting MPD's argument that an arbitral reinstatement award was contrary to public policy: "If MPD nonetheless believes the risk of repeated arbitrator decisions such as this one endangers public safety, it has other recourse—to the legislature or even to PERB in its rule-making capacity—assuming it cannot 'negotiate a modification of the contract.'" *D.C. Metro. Police Dep't v. D.C. Pub. Emp. Rels. Bd.*, 901 A.2d 784, 790 (D.C. 2006) (quoting *Am. Postal Workers v. U.S. Postal Service*, 789 F.2d 1, 7 (D.C. Cir. 1986)).

[12] Section 1-617.08(c) provides that:

(1) All matters pertaining to the discipline of sworn law enforcement personnel shall be retained by management and not be negotiable through bargaining, including substantive or impacts-and-effects bargaining.

(2) This subsection shall apply to any collective bargaining agreements entered into with the Fraternal Order of Police/Metropolitan Police Department Labor Committee after September 30, 2020, and to any collective bargaining agreements automatically renewed on or after September 30, 2020.

We think the Council's decision to grandfather the negotiated grievance process for the time window specified in the legislation, at the same time the Council enacted D.C. Code § 5-107.01(f) to preclude the hiring of police officers who had been determined to have committed serious misconduct (and at the same time the Council made some other provisions of the legislation retroactive[13]), indicates that the legislature was willing, as a matter of public policy, to tolerate some additional arbitral awards reducing MPD-imposed penalties (presumably including terminations for misconduct which MPD believes warrants termination), in order to honor existing collective bargaining agreements. To state the point differently, the Council's decision to delay the effective date of Section 1-617.08(c)—one of a battery of greater-police-accountability provisions, including Section 5-107.01, that the Council included in the Comprehensive Policing and Justice Reform Amendment Act of 2022—leads us to conclude that the policy embodied in Section 5-107.01 (i.e., the policy that an individual who has engaged in the criminal use of deadly force is to be excluded from the police force in the District of Columbia) is not a "dominant" public policy[14] that must, at least with respect to arbitral awards

---

[13] *See D.C. Metro. Police Dep't v. D.C. Pub. Emp. Rels. Bd.*, 301 A.3d 714, 718 (D.C. 2023) ("[W]e reject FOP's challenges to the constitutionality of applying [the Comprehensive Policing and Justice Reform Amendment Act of 2022] retroactively.").

[14] *Cf. E. Associated Coal Corp.*, 531 U.S. at 63-67 (reasoning that where "[n]either Congress nor the Secretary ha[d] not seen fit to mandate the discharge of

such as the 2017 award at issue here, override other public-policy considerations (such as "this Nation's longstanding labor policy" to give "employers and employees the freedom through collective bargaining to establish conditions of employment"[15]). Accordingly, we cannot agree with MPD's assertion that either Section 5-107.01(f) or Section 873.11 or both "indicate that the only acceptable penalty for [Officer] Thomas's misconduct is termination."[16] Neither provision "specifically militates against the relief ordered by the arbitrator." *Stead Motors of Walnut Creek v. Auto. Machinists Lodge No. 1173*, 886 F.2d 1200, 1212-13 (9th Cir. 1989). If the arbitral award must be vacated as on its face contrary to public policy, that conclusion must rest on some other ground.

MPD does not take issue with PERB's fact-specific-inquiry approach to determining whether an arbitral award violates public policy. We likewise agree with PERB's fact-specific-inquiry approach, and we note in particular that its consideration of "whether there is a longstanding practice of requiring the termination of similarly situated employees" is consistent with the Supreme Court's

---

a worker who twice tests positive for drugs," the Court "hesitate[s] to infer a public policy in this area" and could not find a "'dominant' public policy to which the arbitrator's decision 'runs contrary.'").

[15] *Cal. Brewers Ass'n v. Bryant*, 444 U.S. 598, 608 (1980).

[16] MPD also argues that termination was called for by the "relevant table of penalties." The record contains only (what appears to be) an excerpt from that table.

admonition against "assum[ing] to declare" a contract contrary to public policy "[i]n the absence of a plain indication of that policy through long governmental practice or statutory enactments." *Muschany v. United States*, 324 U.S. 49, 66, 67 (1945). MPD argues, however, that PERB "failed to identify all the relevant considerations."[17] Citing factors considered by courts in some other jurisdictions and especially the Connecticut Supreme Court decision in *Burr Road Operating Co. II v. New England Health Care Employees Union, District 1199*, 114 A.3d 144 (Conn. 2015), MPD faults PERB for failure to consider whether the misconduct "would expose the employer to substantial liability if it were to reoccur"; "whether the nature

---

[17] MPD also argues that PERB "misapprehended the content of the arbitrator's decision." As MPD notes, the arbitrator did not actually find that Officer Ford's conduct was "similar to that of [Officer] Thomas"; rather, the arbitrator found that Officer Thomas's conduct was "as close to similar misconduct as is in evidence." We do not regard that as a material misapprehension. MPD also highlights that, contrary to PERB's paraphrase, the arbitrator did not say "that there was a good chance of [Officer Thomas's] rehabilitation." We take the point, however, that PERB's counsel made at oral argument: that we should ask whether there is *any* reasonable reading of the arbitrator's decision to support PERB's paraphrase. We are satisfied that "a good chance of rehabilitation" was a reasonable reading of the arbitrator's statement that "a long suspension without pay and mandatory training of Thomas and, if necessary, counseling and educational meetings with officers with specific disciplinary warnings of severe discipline *might well* have deterred similar conduct of Thomas and others" (emphasis added) and "might also have resulted in Officer Thomas['s] rehabilitation[.]" *See May Well*, Cambridge English Dictionary, https://dictionary.cambridge.org/us/dictionary/english/may-well; https://perma.cc/9G5F-YUTH ("If you say that something may well happen, you mean that *it is likely to happen*") (emphasis added).

of the employment at issue implicates public safety" or implicates the public trust, such that, for example, reinstatement in face of the misconduct would undermine the public's faith in the criminal justice system; whether the misconduct caused severe harm and "strikes at the core . . . of the relevant public policy"; the egregiousness of the offense, encompassing considerations such as "the intent of the grievant with respect to the offending conduct"; and whether there is a substantial risk that the employee will reengage in the offending conduct. 114 A.3d at 156-59. MPD asserts that all of these factors, which PERB either did not list or did not actually consider, weigh in favor of finding that the arbitrator's award reinstating Officer Thomas was on its face contrary to public policy.[18]

We do not discount the importance of all the foregoing factors. We agree that they all are highly relevant in MPD's determination of what discipline it should impose and might reasonably guide arbitrators as well. PERB included many of them

---

[18] We note that the factors PERB did consider appear to be drawn from 6B D.C.M.R. § 1606.2, a regulation adopted pursuant to the CMPA that governs adverse actions against District of Columbia employees generally but that is inapplicable to "[s]worn members of the [MPD]," 6B D.C.M.R. § 1600.2(g); or from the *Douglas* factors. But PERB did not list as factors to be considered the employee's "contacts with the public, and prominence of the position" or "[t]he notoriety of the offense or its impact upon the reputation of the agency or the District government," *see* §§ 1606.2(b) and (h) and *Douglas* factors 2 and 8, factors that seem particularly relevant to the discipline of law enforcement officers and that at least arguably would have weighed in favor of a determination that the arbitral award was contrary to public policy. So we agree that PERB's list of factors was incomplete.

in its analysis, even if not in so many words, and although it did not expressly address some of the factors it identified, we do not see that as particularly relevant given our de novo review. In conducting that review, we are obligated to recognize that "[t]he public-policy exception to the enforcement of arbitral awards is 'extremely narrow,'" *Thomas I*, 282 A.3d at 606, such that we should "invalidate contract terms [a term that we have construed to include arbitral awards] that are contrary to public policy only in the clearest of cases, and with great caution." *Roberts v. Advanced Bldg. Design, Inc.*, 339 A.3d 758, 763 (D.C. 2025) (quoting *Moore v. Jones*, 542 A.2d 1253, 1255 (D.C. 1988)). And, to ascertain whether there is a well-defined public policy that is not spelled out in laws but that is contravened by an arbitral award, we are obliged to look to "legal precedents." *D.C. Metro. Police Dep't v. D.C. Pub. Emp. Rels. Bd.*, 901 A.2d at 789.

That said, as we observed in *Thomas I*, "[c]ourts around the country have divided when confronting" issues similar to the one presented here, 282 A.3d at 606, making the precedents difficult to categorize and apply. Nonetheless, our assessment is that, generally, where appellate courts have vacated or affirmed the vacatur of arbitrators' decisions reinstating police officers or other law enforcement (including correctional) officers on the ground that any discipline short of termination would offend public policy, the misconduct pertained to one or more of the following: abuse or exploitation of vulnerable individuals (including arrestees or inmates) or

some other abuse of power; multiple instances of dishonesty; a failure to acknowledge the misconduct; or reinstatement with lenient or no sanctions. *See, e.g.*, *City of Boston v. Boston Police Patrolmen's Ass'n*, 824 N.E.2d 855, 857, 861 (Mass. 2005) (holding that reinstatement of police officer in favor of a one-year suspension would offend public policy "[g]iven the arbitrator's findings that [the officer] had falsely arrested two individuals on misdemeanor and felony charges, lied in sworn testimony and over a period of two years about his official conduct, and knowingly and intentionally squandered the resources of the criminal justice system on false pretexts," facts showing "egregious dishonesty" and lack of integrity); *City of Seattle v. Seattle Police Officers' Guild*, 484 P.3d 485, 489, 503 (Wash. Ct. App. 2021) (holding that reinstatement of officer with a 15-day suspension was "so lenient" as to be contrary to public policy where the officer in question punched a handcuffed, inebriated woman in the face hard enough to cause an orbital fracture);[19] *Matter of*

---

[19] The *City of Seattle* court relied on an additional fact that we deem pertinent but that is not applicable here: that the Seattle Police Department (SPD) was subject to a consent decree, entered pursuant to 34 U.S.C. § 12601, that imposed on it an affirmative duty to "sufficiently discipline officers who engage in conduct that could contribute to an unlawful pattern or practice" of use of excessive force. *Id.* at 497. The U.S. Department of Justice had specifically found that the SPD engaged in an unconstitutional pattern of "the use of excessive force on subjects who were already restrained." *Id.* at 497. The consent decree specifically provided (in language pertinent to the *City of Seattle* facts) that "[o]fficers normally should not use reportable force against handcuffed or otherwise restrained subjects unless necessary or reasonable under the circumstances to stop an assault, escape, or as necessary to fulfill other legitimate law enforcement objectives." *Id.* The federal court overseeing the consent decree concluded "that any provision that implicates officer discipline

*Bukowski* (*State of N.Y. Dept. of Corr. & Cmty. Supervision*), 50 N.Y.S.3d 588, 590, 593 (App. Div. 2017) (vacating arbitrator's decision reinstating correctional officer who deliberately kicked an inmate in the groin, thereby rupturing his testicle, as discipline for talking during inmate "count" and falsely denied having done so, a factor that "differentiate[s] this case from prior determinations in which courts have declined to disturb penalties imposed by arbitrators"); *City of Brooklyn Ctr. v. L. Enf't Lab. Servs*., 635 N.W.2d 236, 238-39, 244 (Minn. Ct. App. 2001) (vacating arbitrator's reinstatement award under the public policy exception in an "extreme and unique" case involving "protracted outrageous behavior" by a police officer who "repeatedly demonstrated a willingness to engage in sexual harassment"—including, for example, by "conducting traffic stops of young women, which resulted in neither the issuance of a citation nor a warning, apparently for the sole purpose of gathering personal information about the young women or for making personal comments to

---

related to use-of-force inherently implicates . . . the [c]onsent [d]ecree's purposes, and thus, must be consistent with them." *Id.* at 498. Citing that language, the *City of Seattle* court observed that under the consent decree, the SPD was required to "*sufficiently discipline* officers who violate the . . . policies designed to ensure constitutional policing," *id*., and that the reinstatement decision "runs directly counter to the policy requiring the City to impose sufficient discipline to deter future instances of misconduct," *id.* at 504. In explaining why the lenient nontermination discipline that the arbitrator ordered was contrary to public policy, the *City of Seattle* court further reasoned that the requirements of the consent decree were implicated by "[e]ach [individual] arbitration award arising out of a disciplinary decision" and that "the public policy against the use of excessive force in policing bars reinstatement under the facts of this case." *Id.* at 500, 507.

facilitate potential social relationships"—and who was the subject of complaints by more than 30 women); *Dep't of Cent. Mgmt. Servs. v. AFSCME*, 554 N.E.2d 759 (Ill App. Ct. 1990) (vacating arbitral award reinstating correctional officer who committed battery on an inmate who was in leg irons after the inmate threw food at officers); *cf. County of De Witt v. AFSCME*, 699 N.E.2d 163, 167 (Ill. App. Ct. 1998) (vacating arbitral award that reinstated nursing home employee who struck a senior-citizen resident in the head, where the arbitrator "never determined that [the employee] did not strike" the resident but "awarded complete reinstatement . . . without the slightest reprimand").

Cases that have upheld arbitral awards declining to terminate law-enforcement officers who impermissibly used force appear, at least implicitly, to have embraced the rationale that for public policy to require termination, there must be a "plain indication of that policy through long governmental practice or statutory enactments." *Muschany*, 324 U.S. at 66, 67. *See, e.g.*, *City of Owasso v. FOP*, 336 P.3d 1023, 1024 (Okla. Civ. App. 2014) (upholding arbitral award setting aside the termination of an officer who stepped on an arrestee's head and elbowed him three times because he "believed the arrestee was going to spit on him," where arbitrator found that injury had not been established and cited the police department's past tolerance in meting out discipline, and where court discerned no evidence that the officer was likely to again employ unreasonable force), and *City of Minneapolis v.*

*Police Officers' Fed'n*, 566 N.W.2d 83 (Minn. Ct. App. 1997), a case cited by PERB, involving a police officer who beat an arrestee with his fists and feet. *Id*. at 85. In declining to disturb the arbitral award that reduced the officer's termination to a twenty-day suspension, the *City of Minneapolis* court observed that the record showed "several instances where officers found to have used excessive force were disciplined, but not discharged" and reasoned that "even within the Minneapolis police department there is no well-defined policy or practice that officers found to have used excessive force must be automatically discharged." *Id*. at 90.

Compare the foregoing cases with a case in which the court remanded the matter for further findings by the arbitrator, who had failed to consider the likelihood that the law-enforcement officer's misconduct would be repeated. *See City of Des Plaines v. Metro. All. of Police, Chapter No. 240*, 30 N.E.3d 598, 606 (Ill. App. Ct. 2015) (arbitrator found that police officer, in three incidents, had punched or pushed arrestees unnecessarily, failed to report the misconduct, and subsequently lied about his actions; noting that the arbitrator failed to address whether there was a likelihood that the officer would engage in similar misconduct involving the use of force in the future, the court remanded the case, stating that "[w]ithout such a finding, we do not have the necessary information to conclude that the arbitration award contravenes public policy" and observing that "[i]f the arbitrator had entered his award based on

a 'rational finding' that [the officer] is unlikely to engage in the offending conduct upon reinstatement, the court 'would be obliged to affirm the award.'").

Given the "extremely narrow" public-policy exception, we are persuaded that the approaches taken in these cases must guide our analysis in this case for purposes of adherence to the Supreme Court admonition that public policy "is to be ascertained by reference to . . . legal precedents and not from general considerations of supposed public interests." *W.R. Grace*, 461 U.S. at 766 (citation modified).

Unlike in the foregoing cases in which an arbitral police-officer-reinstatement award was overturned as contrary to public policy, there was no finding that the officer, understanding the victim (here, Mr. Lemus) to be vulnerable, abused his authority or assaulted him with vindictive or other ill intent. Further, the arbitrator found that Officer Thomas exercised poor judgment and that his use of force was not objectively reasonable, but not that he was dishonest. In addition, the arbitrator prescribed a lengthy suspension and suggested "mandatory retraining" and, as necessary, counseling and education (all of which, FOP acknowledged at oral argument, the arbitrator's decision left MPD free to require), which the arbitrator thought "might well have deterred" any similar conduct by Officer Thomas in the future.

To be sure, Mr. Lemus was grievously injured as a result of Officer Thomas's conduct; the arbitrator found, with ample justification, that Officer Thomas was guilty of reckless endangerment under Maryland law; and MPD asserts that his conduct amounted to felonious assault under District of Columbia law. But despite the clear and well-defined public policy against police use of criminal violence, the instant case is prevented from being among "the clearest of cases," *Roberts*, 339 A.3d at 763, in which the "contrary to public policy" exception applies, because of several factors: Officer Thomas's claim, described and not specifically discredited by either the arbitrator[20] or the Adverse Action Panel, that he shot Mr. Lemus because he was "in fear for his life," i.e., that he subjectively believed that he was in imminent danger of death or severe bodily injury when Mr. Lemus reached into his pocket; the divergence of views within MPD about whether Officer Thomas's use of force was justified;[21] Officer Thomas's lack of disciplinary history; and the

---

[20] Courts agree that "the factual findings of the arbitrator . . . are not subject to judicial review." *Burr Road*, 114 A.3d at 158; *Ngo v. Oppenheimer & Co.*, 834 F. App'x 675, 677 (2d Cir. 2021) ("[W]e accept the arbitrator's factual findings."); *AFSCME v. State*, 529 N.E.2d 534, 538 (Ill. 1988) ("[I]t is the arbitrator's view of the facts [that the parties] have agreed to accept.").

[21] The arbitrator summarized the initial decisional steps within MPD as follows:

> MPD's firearms training Branch concluded that the shooting was in conformance with their policies. Detective King of MPD IAD investigated and concluded that the shooting was justified. Detective King's supervisor, Lt

arbitrator's focus on Officer Thomas's recklessness and on his putting both himself and Mr. Lemus in harm's way by exiting the residence (the primary misconduct, that was "compounded" by the shooting). We note that the record contains no video evidence of the shooting, and thus this is not a case in which video evidence undermines the claim that the officer could have subjectively believed that his life was in imminent danger when he fired the shots. And there is the example of Officer Ford, about whom we know little except that he was disciplined but not discharged even though his victim died from his wounds.

On this record, while we can agree that MPD had a sufficient basis to terminate Officer Thomas as a management prerogative, and even though "general considerations of supposed public interests"[22] might cause us to prefer a different

---

> Middleton . . . disagreed with Detective King's conclusion. . . . The Use of Force Review Board in a split decision agreed with Lt Middleton's recommendation that Officer Thomas' use of his service pistol was not justified.

The Adverse Action Panel found that Officer Thomas's use of deadly force was not objectively reasonable and that Officer Thomas exercised incredibly poor judgment, but made no finding as to whether Officer Thomas subjectively believed he was in imminent danger.

[22] *W.R. Grace*, 461 U.S. at 766; *Muschany*, 324 U.S. at 66.

outcome, we decline to hold that the arbitral award is on its face contrary to a well-defined public policy.[23]

Wherefore, the judgment of the Superior Court upholding the PERB decision is affirmed.

*So Ordered.*

BECKWITH, *Associate Judge*, dissenting: Under District of Columbia law, someone who wants to become a police officer in the Metropolitan Police Department is "ineligible" to do so if he was "previously determined by a law enforcement agency to have committed serious misconduct, as determined by the Chief by General Order." D.C. Code § 5-107.01(f)(1) (2025). This statute—though relatively recent—echoes a longstanding regulation stating that an individual who "engage[s] in any conduct which would constitute a felony in the District of Columbia" is "ineligible to become a police officer." 6B D.C.M.R. § 873.11(a) (2009). In this case, it is beyond serious question that Michael Thomas's act of

---

[23] Notably, in *D.C. Dep't of Corr. v. Teamsters Union Loc. No. 246* (*Teamsters*), 554 A.2d 319 (D.C. 1989), this court affirmed a PERB decision that sustained an arbitrator's decision reducing the adverse action against a correctional officer from termination to a thirty-day suspension even though the correctional officer had hit a former inmate with a hammer in a drug deal gone bad, conduct that led to a charge of assault with a dangerous weapon, a felony (though the officer was convicted of the lesser offense of misdemeanor simple assault, pursuant to a plea bargain). *See id.* at 320, 321. Thus, the instant case is not the first in which we have declined to overturn on public policy grounds an arbitral award reinstating a law enforcement officer who (allegedly) committed a felonious assault.

shooting an unarmed man twice and nearly killing him—when, according to the arbitrator, that man, Julio Lemus, "was not breaking into the car, damaging the car or committing any crime"—constituted a felony in the District of Columbia. And although Officer Thomas had been on the force for three years when he shot Mr. Lemus, the court acknowledges that "[t]here is some force to MPD's argument that public policy regarding whether to retain officers who have engaged in the unlawful use of deadly force (or some other felonious criminal act) should be the same as public policy regarding the hiring of police officers." *Ante* at 17.

In my view, MPD's argument has enough force to be dispositive in demonstrating that the arbitral award—which rejected MPD's termination of Officer Thomas and instead suspended him for 45 days—on its face violated a "well defined and dominant public policy," not simply a "general consideration[] of [a] supposed public interest[]." *D.C. Metro. Police Dep't v. D.C. Pub. Emp. Rels. Bd.*, 282 A.3d 598, 606 (D.C. 2022) (quoting *D.C. Metro. Police Dep't v. D.C. Pub. Emp. Rels. Bd.*, 901 A.2d 784, 789 (D.C. 2006)). If—as the District has determined—individuals who have engaged in felonious misconduct are not fit to be MPD officers in the first instance, then individuals who have already received MPD training and still go on to shoot and gravely injure unarmed people without justification are equally "ineligible" for the job. *See City of Boston v. Bos. Police Patrolmen's Ass'n*, 824 N.E.2d 855, 861-62 (Mass. 2005) ("[B]y implication," laws that "forbid[]

persons found to have engaged in [felonious] conduct from being police officers" likewise preclude them "from remaining police officers.").

The court's reason for ultimately rejecting the force of MPD's public policy argument does not convince me otherwise. The court concludes that D.C. Code § 5-107.01(f) and 6B D.C.M.R. § 873.11 do not establish a dominant public policy against hiring and reinstating MPD officers who have engaged in felonious misconduct because of the significance my colleagues accord to the D.C. Council's decision to delay the effective date of a police reform measure it enacted to replace the negotiated grievance process in prior MPD collective bargaining agreements with a system that put MPD management in sole control of sworn officers' discipline. Specifically, the Comprehensive Policing and Justice Reform Emergency Amendment Act of 2020[1] included a provision requiring that "[a]ll matters pertaining to the discipline of sworn law enforcement personal shall be retained by management and"—contrary to previous practice—shall no longer "be negotiable" as part of a collective bargaining agreement. *See* Comprehensive Policing and Justice Reform Emergency Amendment Act of 2020, D.C. Act 23-774, § 116, 67

---

[1] Two years later, the Council passed the Comprehensive Policing and Justice Reform Amendment Act of 2022, which—among other things—made permanent the Emergency Amendment Act of 2020's transfer of disciplinary power from a matter subject to collective bargaining to an issue under the sole discretion of MPD management. D.C. Law 24-345, § 116(b), 70 D.C. Reg. 953 (2022) (codified at D.C. Code § 1-617.08(c)(1)).

D.C. Reg. 12993 (2020) (codified at D.C. Code § 1-617.08(c)(1)). Unlike other parts of the Act, this subsection was not immediately effective—instead, it delayed transfer of complete disciplinary power to MPD management until September 30, 2020, the date a new collective bargaining agreement between the Fraternal Order of Police and the MPD Labor Committee was set to be renegotiated or renewed. D.C. Act 23-774, § 116; D.C. Code § 1-617.08(c)(2); *see Fraternal Ord. of Police, Metro. Police Dep't Lab. Comm., D.C. Police Union v. District of Columbia*, 502 F. Supp. 3d 45, 51 (D.D.C. 2020) (stating that the relevant collective bargaining agreement was "effective through September 30, 2020, and automatically renewed for one-year periods thereafter"), *aff'd*, 45 F.4th 954 (D.C. Cir. 2022); Collective Bargaining Agreement Between District of Columbia Government Department of General Services and Fraternal Order of Police/Protective Services Division Labor Committee, at 30 (approved Sept. 28, 2017); https://perma.cc/4CML-D4PZ. This amounted to a ten-week delay between the time the Mayor signed the Act into law and the date the subsection went into effect.

In the view of my colleagues, this decision by the Council to delay implementation of D.C. Code § 1-617.08(c)(1) shows that the public policy embodied in 6B D.C.M.R. § 873.11 and D.C. Code § 5-107.01—favoring excluding individuals who have engaged in the criminal use of deadly force from the D.C. police force—was not as consequential as MPD suggests. The court's reasoning is

based on what it sees as the competing public-policy consideration evidenced by D.C. Code § 1-617.08(c)(2)—namely, as the court characterizes it, "this Nation's longstanding labor policy" to give "employers and employees the freedom through collective bargaining to establish conditions of employment."[2] *Ante* at 20 (quoting *Cal. Brewers Ass'n v. Bryant*, 444 U.S. 598, 608 (1980)).

At the outset, that neither PERB nor the union has made this argument makes me question whether it should be the basis of our conclusion that suspending Officer Thomas for 45 days was not on its face contrary to public policy. *See, e.g.*, *Cox v. United States*, 325 A.3d 360, 372 (D.C. 2024) ("This court does not normally consider arguments that the parties have not raised."). It is not obvious, moreover, why a separate statute, in a separate part of the D.C. Code, addressing a separate issue has any meaningful effect on the clarity or dominance of the public policy established by 6B D.C.M.R. § 873.11 and reinforced by D.C. Code § 5-107.01.

---

[2] Regardless of the standard of review we generally apply to PERB's interpretation of its own statutes and implementing regulations, including 6B D.C.M.R. § 873.11, no deference is appropriate here where the Board "did not conduct 'any analysis of the language, structure, or purpose of'" the regulation. *Proctor v. D.C. Dep't of Emp. Servs.*, 737 A.2d 534, 538 (D.C. 1999) (quoting *Mushroom Transp. v. D.C. Dep't of Emp. Servs.*, 698 A.2d 430, 433 (D.C. 1997)). And as to D.C. Code § 5-107.01(f), more specifically, we have declined to "defer to PERB in interpreting statutes other than the" Comprehensive Merit Personnel Act. *D.C. Fire & Emergency Med. Servs. Dep't v. D.C. Pub. Emp. Rels. Bd.*, 105 A.3d 992, 996 (D.C. 2014).

But more fundamentally, the Council's decision to delay the end of the negotiated grievance process was not so much evidence of a competing policy favoring the freedom to bargain collectively over conditions of employment as it was a temporary measure that avoided violating the Contract Clause's prohibition against laws that retrospectively "impair[] the obligation of contracts." U.S. Const. art. 1, § 10, cl. 1; *see* D.C. Code § 1-203.02 (extending the Contract Clause to the District of Columbia); *see also Fraternal Ord. of Police*, 45 F.4th at 961 (rejecting FOP's Contract Clause challenge to D.C. Code § 1-617.08(c)(1) because the clause "applies only to laws with retrospective, not prospective, effect," and because subsection 1-617.08(c)(1) "applied only to collective bargaining agreements entered into after the parties' 2017 Agreement expired on September 30, 2020" (quoting *Loc. Div. 598, Amalgamated Transit Union v. Massachusetts*, 666 F.2d 618, 637 (1st Cir. 1981))). And the fact that the new statute "grandfather[s] the negotiated grievance process for the time window specified in the legislation," *ante* at 19, does not mean that the new statute "grandfathers" other collectively-bargained-for rights.

In sum, the D.C. Council and the D.C. Department of Human Services have reflected the District's concern that residents be safe from violent and irresponsible police officers by establishing a well—defined and dominant public policy prohibiting individuals who have committed felonies from serving in the MPD.

Because enforcement of the arbitrator's award was clearly contrary to that public policy, I respectfully dissent.